Appellant submits that the record in this case clearly shows that the District Court improperly granted summary judgment to the defendants by deciding disputed issues of fact in the defendant's favor, thus invading the province of the jury. So I'm assuming that you are suggesting that it was not crediting the Clinton report. Is that what you're primarily referencing in terms of what you think are disputed facts? Really, three points. The first one being the Clifton report in that there were competing expert reports, and a highly credentialed expert that we had, Tony Clifton, reached the conclusion Okay, I'm sorry. So you said there were three. Why don't you tell us the first three, and then we'll go after each of them. Sure. Conflicting expert reports. Secondly, that Wipro admitted liability and responsibility Okay, so for the use of the word responsible in that email chain. Okay, and what's the third? And the third would be the internal documentation produced by Wipro during the discovery process, which makes it crystal clear that Wipro had aggressively monitored and managed and surveilled Wipro-controlled devices, including the appellant's controlled device. So, did you want to jump in? I'm sorry, I thought I interrupted you. So let's talk about the Clinton report first, then. So, we're not obligated to credit speculatory or unsubstantiated allegations. Is that correct? Would you at least agree with that as a proposition of law? And I know you will dispute that the Clifton report is not that, but will you at least agree with that? Yes, that's axiomatic. What does the Clifton report do as to the facts of this case, rather than the general views on what he had general views? The Clifton report... What did he say that establishes the true claim that you are right? Sure. The Clifton report found that Wipro had monitored the appellant's workflow contemporaneously. Did they say that it had put these programs, these two programs, on her laptop? Did he say that? Yes, the Jamf software and CrowdStrike. It's undisputed that the CrowdStrike, the number two, was installed on her computer. But what I think my colleague is asking is, he didn't investigate the Vexler laptop or system, and you have it contradicted by the FTI reports, forensic analysis, and you have what I read as a theorizing that it happened. So where in the Clifton report do you think there's actually a non-conclusory or non-speculative or non-theoretical allegation that he knows for certain that it happened? Yes. Yes, he found conclusively that there were contemporaneous monitoring of her keystrokes and also browser tabs, and that's admitted by Wipro in their discovery in their... That doesn't mean that Wipro put them on her laptop, does it? No, and whether Wipro put Jamf on her computer or not is irrelevant to this Court's analysis. Okay, so what I think you meant by that last statement is a dispute over what the word intent means, like whether or not it intended because it happened or because it exists in some background context or whether someone affirmatively attempted to do something For the purposes of all three statutes, because all three require intentionality or purpose, what is the legal definition that you would have us use here? We would have you use your own legal... The Court's own legal definition in U.S. v. Townsend, a 1993 case where the Court said that a party's deliberate enabling of monitoring functions, not necessarily the installation, but the monitoring functions was an act... Wait, did you just say enabling? Did you just say enabling? A party's deliberate enabling of monitoring functions was an act that, quote, must have been the product of a defendant's conscious objective rather than a product of mistake or accident. But what's the evidence that they deliberately monitored, that they deliberately enabled? Actually, let me ask you a question to perceive that. The defendant's report, the appellate's expert report, was a forensic report. Your client's expert report is not, right? I mean, your client's expert did not actually forensically examine the computer, the plaintiff's computer, whereas the defendant's expert did. He did examine the computer and review it. In fact, his report has certain charts and information that he pulled off that computer. He does not define it as a forensic examination, which might have been more detailed. But he did examine, he had the computer, he examined it, he went through it and determined that there were contemporaneous records of keystrokes, an act of monitoring. Right, but I'm focusing on the word enabling of the monitoring function, not the monitoring function itself. But how did, what's the evidence that the defendant's case, the appellate's case, actually enabled it? In other words, caused it to be placed there? Oh, well, it's in the district court opinion itself. On page three, states as follows. The question, I think the question was the evidence, not what the district court said about it. Oh, okay. I'm sorry. The lower court judge quoted the evidence. The evidence is the deposition of Rajiv Kalai, the chief information officer of Wipro, who at page 409 of the record, quote, stated that Wipro can install CrowdStrike. He was asked whether Wipro had installed CrowdStrike on her computer. And he conceded that Wipro can install CrowdStrike from the back end with, I paraphrase, without the computer. Can install or didn't install? Well, in this case, he found that CrowdStrike was, was, could be installed, and in this case had, it's a clear inference that it did install it on her computer. Once the Jamf, J-A-M-F, software was on the computer, according to Mr. Kalai's testimony, the second step would be to use that Jamf avenue. In this case, it was the email, Wipro's email issued by Wipro that was then used as the avenue or the conduit for the installation of CrowdStrike, which is an extremely aggressive software program. Okay. I'm sorry.  So, you say that. Can you tell me what are the record sites that you think best establish that it was, that the software was used for the purposes you allege that it was and that it was, that it could be done and that it actually was used for those functions? Okay. Well, the A409 is the deposition of their chief information officer who, in our view, is conceding that they could do it and inferentially did do it in their case. So, that's the could. Where's the did? On record A219 is a document produced in discovery by Wipro relating to CrowdStrike. We said, give us all relevant documents to the appellant's computer. It's very hard to read. I'm going to have to take this back at Chambers and look at it. I used the magnifier. So, you think A409 is the could and A219 is the did? Yeah. A219, you'll see the words, words aggressive monitoring. Well, when you take it back and enlarge it. Okay. So, I just want to make sure. Okay. I'm sorry. And then one other I would draw the court's attention to would be record A231, which was discovery responses to interrogators, I believe, where Wipro concedes that they maintained browser history logs for 89 days. They were explaining why they did not have the browser logs for this particular appellant, because they only kept the browser logs for 89 days. Okay. So, if we decide that the ECPA only applies to contemporaneous interception, that would cover keystrokes. Is that your allegation? Is there anything else? That is correct. I'd like to emphasize that under the CFAA, it's without question, it's undisputed that she lost the use of her computer for nine days. She lost it. Okay. And so, does your SCA claim stand if we think that the statute doesn't apply to personal computers? Do you still have an allegation? Well, I think there is a question as to that under the SCA. And we would argue that personal computers. I agree. But if we disagree with you and decide that it doesn't apply, do you still have an SCA claim? Is there another reason if we decide that it doesn't apply to personal computers? Under SCA. I think we'd have to concede that under the SCA, but not under the CFAA. I'm glad you mentioned that, too. Okay. What is the basis for finding that she meets the $5,000 damages threshold? Well, she lost the use of her computer for nine days of work. Okay, but you didn't submit additional quantifying damages, right, information? It's just she wasn't using, she couldn't use her computer for nine days, and we have to infer that that meets the $5,000 damage requirement? Is that right? That in part. She also testified that she lost, she was technically employed, got her 1099s from Creative Circle, and because of this incident, the interruption of service, which is a loss or a damage under the CFAA, she lost the relationship with Creative Circle, which no longer gave her assignments, as they had given her an assignment to Wipro. She had no other way to be in touch with that company except for this particular device? Well, she was in touch with Creative Circle, but this put Creative Circle in a difficult position because Creative Circle, she asked Creative Circle to advocate for her with Wipro to get her paid for the time that she couldn't work, et cetera, and Creative Circle basically dropped her from their roles of freelancers who were in their particular stable. She actually didn't have any work for a period of months and did not gain employment until months later. So although we didn't submit an economist expert report on what those damages are, reason and logic would dictate that the amount was certainly far in excess of $5,000. I think we will hear from you on rebuttal. Is that good? Okay. Thank you so much. Good morning, Your Honors. May it please the Court, my name is Jung Park, and I represent Wipro, LLC. I'm just going to touch base on some of the points that Mr. Callum had made before I go into my presentation. Regarding the CFAA, Vexler did not produce any evidence during discovery to substantiate her claim that she had lost economic damages of $5,000 or more. Do you think at this stage that is her testimony that it's enough? Well, she testified that she was unemployed at that time, and she was able to conduct job interviews during the time that she had, as she claims, lost use of her laptop. So there were no economic damages. As far as Creative Circle is concerned, there's been no evidence, no testimony by anybody from Creative Circle that says that they dropped her due to the situation with Wipro. So I don't think they have a claim under CFAA, and that's probably the easiest statute that we can address. Regarding the tiny letterings that we saw in A219, I personally also have a very hard time seeing it, even with glasses. But those are actually security settings. I'm going to need a real big magnifying glass to see those tiny little letters. But those are actually security settings and configuration settings. When you see aggressive, when you go back into chambers to look at it, those are not... You jumped. Are we still on the SBA? Now we're on the SBA. Okay. So can you answer the question about... I have two questions related to this. Do we have to reach the question of whether or not it applies to personal computers, or is there another way to dispose of the claim? Well, that is one way to dispose of the claim. That is a very technical way. It's a personal laptop, and the SBA doesn't apply to a personal laptop. But the overall question here... No, no, no. I was just going to ask, the question is, is there any evidence for the plaintiff's case? Is there any evidence that they, in fact, were putting stuff on her laptop or not? If there wasn't, what are we doing? So there is no evidence that Wipro had installed Jamf or... Well, there's no evidence that Wipro had installed Jamf without her consent or authorization. Well, even with her consent, was there any? Jamf was installed into her laptop, and so was Crossbreak. By your client without her consent? Your client did do it, but because she asked. I didn't understand that to be your theory. I thought your theory was you didn't know how it was done. Your client expert speculated that it may have happened, but it couldn't have happened the way that they did it. So now you are now saying, what, that you guys knew you did it, but she consented to it? No, we didn't know we did it when we were notified by Creative Circle or by her that she had the Wipro managed device on her laptop several months after she had left Wipro. We went and looked, and it was the Jamf installed that was placed onto her laptop. But not CrowdStrike? CrowdStrike was also placed. But I think it would help if I explained how it got installed. Well, that's disputed. Just be careful. It's not to your advantage to create an issue of fact. Well, I don't think there is an issue of fact because they haven't produced any evidence that it was installed without her knowledge or consent. Except for her testimony. Except for her say-so and her expert who didn't do a forensic examination. In fact, his expert report says he's not doing a forensic examination. Yeah, but he didn't say he didn't look at the computer. He just said he didn't do a forensic examination because he couldn't control the chain of custody. Well, he did look at her computer. I don't want to get on a sideshow, so just make sure that you are very focused about what it is that you are trying to tell us. Just going back to the CFA, the SCA, sorry, I'm getting all these acronyms confused. The SCA, the question was, if it is a personal laptop, then the statute doesn't apply. For the CFAA, there's no economic damages, so the statute doesn't apply. So now we're left with the ECPA, which is the... You can go back to it if you want, but supposing there were damages, then there's liability. Well, no, because all three statutes require that the software be installed intentionally, deliberately. I would have thought that's a stronger point than that there are no damages. Right. So the overarching question was whether the software was intentionally installed into her laptop. Intentional installation requires that it was without her consent or knowledge, and there's only three ways that... It also requires them to intentionally do it and not... Right. I mean, we have lots of law on people clicking boxes and whether or not they got noticed. Are you asking us to look into that and whether or not... I mean, this is a whole issue. No, no. What is your theory, then? So the theory is that Wipro did not intentionally install. In fact, all the e-mail correspondence that we saw in the record shows that there was a lot of confusion on Wipro's end, didn't understand how it got installed, why it was installed, because she was actually a freelancer. She wasn't a Wipro employee. There was no reason for her to download Jamf onto her laptop. So there was no intent to install. There's no evidence... We don't know for sure, Your Honor, but we... We don't know for sure, but all the software manuals, Jamf, Apple computer, our chief information officer, our expert, all say the same thing. It couldn't have been installed without her knowledge or consent. It doesn't matter whether they installed it or they didn't. There's no reason to believe it was without her consent. That's right, Your Honor. There's no evidence that it was intentionally installed. There's no ill intent. I mean, you're saying two different things. One is saying she got notice and her consent to it obviates your intent. The other is you have no idea. Something went wrong. You were speculating that it happened. And they're not the same theory, so you need to figure out which one is it. Well, we don't know exactly how it got installed, but we know that there's only three ways that it could have gotten installed into her computer. So one way is if Ms. Vexler asked to be installed and then she goes through an 18-step process, which requires her to input her personal user ID and password, which Wipro never had access to, and then for her to press the consent button. That's the 18-step process that she had to go through. She had to go through three. Yes. The second way is if she tried to configure her temporary Wipro email address into an app like Outlook, that would also prompt the installation of GEMF. Again, same 18-step process. She would have to input her user ID and password, which Wipro did not have access to. She would have to press the consent button. The third way is when she was using her web mail, which is what she was supposed to use, when she was using her web mail, she tried to download a Wipro document attachment instead of just viewing it on her computer. That would also prompt her to install GEMF. Again, the same 18-step process. She has to input her user ID and password. She has to press the consent button. That's corroborated. Yes. No. There's no way for Wipro to push GEMF into her computer without her knowledge or consent. That's corroborated by the Apple Guide, the GEMF websites, all the technical manuals out there. Yes. There's absolutely no way, because Wipro never had access to her user ID and password. That's her personal user ID and password. So this idea that somehow Wipro had pushed this software into her computer just cannot be true. And there's no evidence to the contrary other than Ms. Flexer thinking that somehow this software just magically appeared on a laptop. There's just absolutely no way. Is there any factual dispute about whether it was installed? However, it was installed, so you're saying your client didn't intentionally put it there. Is there any dispute about the fact that it was installed months after she was onboarded as opposed to when she was onboarded? Right. The forensics show, our forensic show, that it was installed months after she started. Not when she was onboarded. No, absolutely not. She onboarded in July of 2021. Somehow she downloaded the GEMF in October of 2021, and then one month later her freelance project had ended. So what's the significance of the fact that it was, in terms of whether it was intentionally installed by Wipro? What's the significance of the fact that it was installed several months after she started? Right. Well, that's plaintiff's theory. Plaintiff's theory is that somehow when she onboarded, when we gave her the temporary Wipro email address and got her hooked up onto the web mail, that somehow we pushed GEMF into her laptop. Again, cannot happen. Impossible. There's no way we can do that without her knowledge and consent, because we need her user ID and password. And she's never testified that she's ever given us that email, that personal ID and password, nor would I expect any person to just hand over such personal information to a freelance employer. So her theory of how it got installed is just not true. It just cannot be true. What about the email saying we're responsible? Well, that was Francesco, her supervisor at Wipro. Now she's testified that she's not an IT person, she's not a manager, she's not an executive at Wipro. When she got alerted that Vexler had on her computer, this is a Wipro managed device, her reaction was, we must have somehow, that must have somehow got installed onto your laptop. But the question is, could a reasonable jury see we're responsible as if we did this? I don't think so, Your Honor, because she's already testified, she's testified that she doesn't, when she said that, she wasn't claiming that now Wipro is legally responsible, that we did this with intent, that we did this with some deliberateness. All she was saying was that Ms. Vexler is saying that she cannot access her computer, she's locked out. She sees this message on her laptop saying this is a Wipro managed device. She wanted it off, which I understand. And Francesco was trying to facilitate that removal and said we need to get it off her computer because, again, there was no reason for her to have downloaded that software. Okay, so our case law, and not just ours, the circuit's nationwide case law, regardless of whether it's a case law or a case law, is regarding when online notices or disclosures are sufficiently clear enough that checking a box leads to consent. It's a messy business and it's very, very fact-intensive. I was not expecting you to argue that the reason there was no intentionality was because at some point she had consented. So can you explain to me why or what is the legal doctrine that you think means that she was sufficiently aware that she actually affirmatively gave notice or consent, or is there a different understanding of intentionality for the purposes of these three statutes? Well, I think all three statutes require that it was done without authorization or exceeded the authorization. This is not a simple check your box and somehow it just magically shows up on your laptop. These are security settings to protect Wipro data. Wipro is an IT company that maintains a lot of confidential information from its clients. It has a lot of security levels. So this is, again, an 18-step process. I understand. That's a very simple one. There are three ways to get on. All three require intensive engagement with the program in order to get it on your computer. So it couldn't have happened by them sending it in. In order for it to be in her computer, she had to have some knowledge of it and some participation. Correct. Also, I don't want to lose sight of the fact that her allegation is that somehow Wipro was able to turn on and off her computer, that they were able to somehow see what she was inputting into her keystroke. Why shouldn't we lose sight? Because there's no evidence. There's no evidence of that. You misunderstand what I'm asking. My point is once you have established that there's no way they could have gotten the program on their computer without her participation, do you have to demonstrate? You've got other arguments. Do you have to demonstrate anything? No. I don't think so. To me, that's case closed. Right. But I do want to justify that those are the three things that she's complaining about, like somehow on and off computer, on and off camera, the keystroke, the accessing her personal data. Even her own experts testified and has it in his report that there is no evidence that her e-mails were accessed. There's nothing that she was he testified that he could have accessed her personal data. He could not have actually looked into whether any of her personal information was viewed, downloaded, accessed, modified. But he testified that it was too expensive. So he didn't do it. There's just no evidence suggesting that. And also, there's what JEMF does and does not do and CrowdStrike. They don't do that. They can't do that. They don't turn on and off computer cameras. I'm wondering why, if I've suggested to you that there are three things she didn't do, any of those three things, and therefore you win, why do you insist that there are other things I should be considering also? No, I think as far as I'm concerned, Your Honor, the fact that there's no way that those programs could have been installed without us having her personal user ID and password, to me, that is fatal to all three of her statutes. And, you know, I don't think there's any conflicting expert testimony. I just want to cover all my bases, Your Honor, because I don't get a rebuttal. All right. Thank you. All right.    All right. We have the testimony in the deposition I cited before from their chief information officer saying that Wipro can install CrowdStrike from the back end. It's not disputed that there was CrowdStrike on her computer, that there was JEMF on her computer, and not only that, it was a JEMF-modified tweaked software, which was on her computer. She could not have gone to an Apple store and downloaded this particular JEMF because it was a Wipro-modified JEMF program, which she had. It required some interaction with Wipro, either as they say, and she denies, that she downloaded it from the Wipro software store, or as Mr. Clifton testifies, that they back ended both the JEMF and the CrowdStrike. JEMF is designed to intentionally install CrowdStrike once you have JEMF on the computer. You would need to have JEMF first. And then CrowdStrike would be, in this case it was a Wipro JEMF program, and then CrowdStrike would be back ended by the provider, in this case Wipro, which wanted to, as counsel says, to protect its proprietary information that would be on her computer. And that's an active monitoring program. Keystrokes are contemporaneous monitoring. It's a standard technique across the board in the industry to keep track of the keystrokes for a number of reasons, one being to avoid the user double-dipping, in other words, charging two employers for the same keystroke. And the other being to avoid the user double-dipping for the same time period. In this case... Thank you.